## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Beverly Mears,

                Plaintiff,

v.

Flint Hills Resources, LLP, *et al.*,

                Defendants.

Civ. No. 16-111 (RHK/KMM)
**MEMORANDUM OPINION
AND ORDER**

Eric D. Satre, Satre Law Firm, St. Paul, Minnesota, for Plaintiff.

Colton D. Long, Cynthia A. Bremer, Stephanie J. Willing, Ogletree, Deakins, Nash, Smoak & Stewart, PC, Minneapolis, Minnesota, for Defendants.

## INTRODUCTION

Plaintiff Beverly Mears commenced this action after her employers, Defendants Flint Hills Resources, LLP and Flint Hills Resources Pine Bend, LLC (collectively "FHR"), demoted her. She alleges the demotion was discriminatory and retaliatory, in violation of the Minnesota Human Rights Act ("MHRA"), Minnesota Statutes section 363A.01 *et seq.* Presently before the Court is FHR's Motion for Summary Judgment. For the reasons that follow, the Court will grant the Motion.

## BACKGROUND

The following facts are presented in a light most favorable to Mears. FHR is an oil refinery in Rosemount, Minnesota. (Sheck Decl. ¶ 2.) Mears has worked there as a union employee in various roles since 1998. In 2012, she was working in a maintenance

position when she took disability leave—she is deaf in her left ear, and a bacterial

infection resulted in severe nerve damage in her legs, making it difficult for her to stand

and walk.  (Mears Dep. 108, 112–13.)  She was cleared to return to work on November 7,

2013, when the events at issue began.  (Id. Ex. 19.)

At the time, FHR had an opening for a Process Lead ("PL") in its alkylation unit

(referred to by the parties as the "alky unit"), one of several units at FHR.[1]  (Id. Ex. 16.)

The PL monitors the unit for optimal performance from a Central Control Room using

the "alky board."  (Sheck Decl. ¶ 5.)  When adjustments in the unit's temperatures,

pressures, and flow rates are required, it is the PL's responsibility to identify the

appropriate adjustments and implement them using the alky board, instruct outside field

operators to make adjustments manually, or both.  (Id.)  "A PL has a very high level of

responsibility to maintain the proper balance and quality of process.  A PL's failure to

perform the position could result in a fire, explosion, or release of product into the

environment."  (Id.)

FHR's posting for PL of the alky unit listed several job requirements, including

"[t]echnical knowledge of process operations," "[q]ualif[ifcation] on associated area in

reasonable amount of time (this will require training on both the outside equipment and

inside console)," "teamwork abilities," "communication skills," and the ability to

"adapt[] to change."  (Mears Dep. Ex. 16.)  It also announced that FHR would offer the

position to the most senior union member who placed a bid regardless of qualifications.

(Id.)  Mears bid and, because she was the most senior union member to do so, FHR

---

[1] The alky unit's function in the refining process is unclear from the parties' briefs.

offered her the job.  She accepted on October 30, 2013, and her training began on

November 11.  (<u>Id.</u> Ex. 20.)  This was the only union position Mears's disabilities would

allow her to perform.  (<u>Id.</u> 104.)

On her first day, Mears disclosed her disabilities to her supervisor, Senior Process

Engineer Dave Sheck.  (<u>Id.</u> 112.)  She also received several documents related to her

training and employment.  Among them was a "[PL] Job Description."  (<u>Id.</u> 104.)  It

provided, in pertinent part:

- 8 to 10 hours sitting with flexibility to move around; must be immediately available by radio.
- During emergency situations may be necessary to work continuously adjusting parameters (temperature, pressure, flow) on control screen with use of computer mouse until the situation is resolved.
- Initial training does require walk through of physical equipment in an outside environment on concrete in order to understand the location of equipment and process flow through the equipment.

(<u>Id.</u> Ex. 17.)  It further provided that the PL must monitor "eight screens for a full shift."

(<u>Id.</u>)  Mears reviewed these requirements and decided to move forward with her training.

(<u>Id.</u> 104.)

The same day, Mears and Sheck reviewed a five-page document entitled "Refining

Skills Training Kick Off Form."  (<u>Id.</u> 122, Ex. 25.)  It listed Sheck as Mears's supervisor

and indicated she would be trained by the alky unit PLs.  The form also provided that the

default "Planned Training End Date" was one year after training began but the "actual

[end] date may be sooner or later."  (<u>Id.</u> Ex. 25.)  Indeed, Sheck noted on the form that

July 11, 2014, eight months later, was Mears's expected end date for training.  (<u>Id.</u>)  He

testified in his deposition that, although the alky board was "one of the less complicated

consoles," he did not actually expect Mears to complete her training in eight months (Sheck Dep. 12, 22).

The form detailed a six-part training process:  the first four components involved the study of voluminous training materials and completion of intermittent competency tests.  (See Mears Dep. 130, Ex. 25.)  The final two components were "Skills Demonstration" and "Board Review."  (Id.)  Skills Demonstration was a "field confirmation with the Trainer . . . that the trainee understands the tasks to be demonstrated and the expected standards of performance.  The Trainee must complete 100% of the tasks correctly to pass."  (Id.)  Board Review, the final step in the process, was "an open discussion with the candidate, senior employees, and supervision to ensure the candidate has the knowledge, critical thinking, job skills and confidence needed, to safely and accurately perform [her] responsibilities in the position."  (Id.)

Finally, the form specified "Trainee Expectations & Responsibilities," including a directive to "[f]ocus on one task at a time."  (Id.)  It provided:

> FHR[] does not require you to become qualified by a certain date . . . The amount of time it takes to qualify varies from individual to individual, because we all learn at different paces.  Most individuals will qualify within a year.  But again, this is not a race and qualifying time varies . . . If you are having difficulty learning or grasping concepts, you, [your] Trainer, Supervisor and Training Department will discuss how best to proceed.

(Id.)  After reviewing these documents with Mears, Sheck directed her to begin studying her training materials at a desk located twenty-five feet from the alky board.  (Mears Decl. ¶¶ 7, 34.)

For the next two months, Mears progressed through the training process without incident. She studied the materials provided and relied on the four alky unit PLs—Randy Edstrom, Charlie Martin, Kevin Allmendinger, and Pat Bergin—to guide her and answer her questions. (Mears Dep. 125.) When Mears completed a portion of her training materials, she was required to obtain a qualified PL's signature confirming her completion. (Id. 126–27.) Often times, prior to signing, a qualified PL would simulate tasks "by talking through them and pointing out what you would do or having the procedure in front of you." (Id. 127.) According to Mears, "[r]ight from the time that [she] got there," she heard Bergin express to others that he "wasn't going to train" Mears, but Bergin subsequently signed off on her training several times. (Id. 128–29.)

On February 25, 2014, Mears had a negative interaction with Martin, who was training her at the time. (Willing Decl. Ex. H.)[2] She posed a question to Martin and, in response, he threatened to stop training her until she toured the outdoor aspects of the alky unit. (Id.; see also Mears Dep. 136.) She explained that her disability prevented her from doing so, and Martin "crossed his arms and started getting in depth on what [she] had] to do." (Mears Dep. 136.) Mears reported the incident to Sheck. (Id.) By the time she returned home that day, Basant Ahluwalia, a member of FHR's Human Resources ("HR") team, had called her regarding the incident. (Id. 140.) Sometime thereafter (it is unclear when), Mears was brought into Sheck's office while someone (Mears was

---

[2] This incident and others are described in a journal Mears kept during her training. She testified that, when "something . . . [she] considered awful[] happened at work, [she] . . . put [it] in [her] journal." (Mears Dep. 23.) The journal raises hearsay concerns, but neither side has objected to the Court considering it, and both rely upon it in their briefs.

unclear who) met with the PLs in a different room.  (Id.)  FHR's HR Director, Michelle

Hinderaker, testified that Sheck and Ahluwalia conducted a respectful workplace training

with the PLs (presumably including Martin) in response to Mears's complaint.

(Hinderaker Dep. 51.)  Additionally, Mears did tour the outside aspects of the alky unit

three times, twice before and once after this incident.  (Mears Dep. 137–38.)

      Next, according to Mears, Sheck told her sometime in April that she would never

qualify as PL.  (Mears Dep. 148.)  Sheck acknowledges that he and Mears "had a one-on-

one discussion in [his] office and she accused [him] of wanting her to fail."  (Sheck Dep.

96.)  He "immediately corrected that statement and said that [it] was not true, [he] was

her ally and [they] needed to work together to make this work."  (Id.)  There is no

reference to this incident in Mears's contemporaneous journal.  Instead, her journal

indicates she was observing the alky board at that time.  On April 21, she wrote "Good

day. Watched Pat [Bergin] and Charlie [Martin] day went good."  (Willing Decl. Ex. H.)

On May 7, "So most of the day, I played with the valves, changed valve outputs, set

points, modes."  (Id.)  On May 19, "So after moving valves for [half] of the day, I went

back to [the] desk and worked on my book."  (Id.)  Similar entries appeared on June 3,

June 17, and July 28.

      Less than one month later, on August 20, Mears formally moved to the Skills

Demonstration portion of her training.  (Mears Dep. 132; Sheck Dep. 32.)  She wrote,

"Training seems to be ok. I am concentrating on what is a good board move and what is not."[3]  (Willing Decl. Ex. H.)

FHR acknowledges that Mears generally met training expectations until August 2014. (Defs.' Answers to Pl.'s Second Interrogs. 17–24.)  However, it claims performance issues arose once Mears began the Skills Demonstration portion of her training. Indeed, the record indicates that alky unit PLs and others expressed concerns to Sheck regarding Mears's performance. (Sheck Dep. Ex. 9.)  On September 3, Sheck met with Mears and took issue with her ability to multitask and work with other members of the alky unit, specifically with respect to answering radio calls from workers in the field. (Mears Dep. 142.)  He stated that she dwelled on the past, which Mears did not understand. (Id. 144.)  Sheck's notes from the conversation indicate he also expressed concerns about her "technical knowledge," specifically as it pertained to compressor startup and shutdown procedures. (Id. Ex. 27 (giving examples).)  He resolved to "ask an experienced PL to participate in a detailed discussion," and he noted "PL understood information and agreed to proceed as directed." (Sheck Dep. Ex. 9.)  Mears testified that she laughed at Sheck's multitasking concern because she was "really good at multitasking." (Mears Dep. 144.)

Sheck followed through and arranged one-on-one training sessions for Mears with Dan McDonald. (Id. 35; Mears Dep. 146.)  McDonald formerly supervised the alky unit

---

[3] In her brief, Mears repeatedly asserts she was forced to complete her written training materials first and "not permitted to observe and shadow the men who worked at the board" until August. (Mem. in Opp'n 25.)  But she identifies no evidence that Sheck or any other FHR employee told her she must complete her bookwork before observing the board, and more importantly, her own contemporaneous journal contradicts her assertion.

and, in Sheck's view, he was "extremely familiar with this area and can be considered a subject matter expert."  (Sheck Dep. 36.)  Though Mears did not know why Sheck brought McDonald in, she described him as a "very nice person [with] a lot of refinery knowledge."  (Mears Dep. 146.)  Their first training session occurred on September 9, during which Sheck and McDonald reviewed specific areas of concern with Mears.  After the meeting, McDonald e-mailed Sheck his assessment of Mears:

> [Mears] has a basic knowledge of the 35 unit.  She has a long way to go to give me confidence that she can shutdown or start up the compressors on her own. Her explanations of the process were in an odd technical manner that I think is only confusing her (my opinion) . . . She should continue to stay involved as much as possible to get actual operating experience on the [console].

(Id. Ex. 28.)  Sheck's notes indicate he concurred with McDonald's assessment.  (Sheck Dep. Ex. 9.)  He added that "[s]he almost continuously diverted the subject to procedure details and very technical chemistry discussion from her previous experience . . . [He] told her a process lead must understand the process so the correct move can be made to secure the unit before a procedure can be referenced."  (Id.)  He also instructed her how to prepare for the next training session.  (Id.)  Mears testified that she and McDonald never discussed compressor startup or shutdown, and she had "no comment" on McDonald's assessment of her.  (Mears Dep. 151, 153.)

On September 22, Sheck held another meeting to discuss Mears's training progress with Mears, Ahluwalia, and Tony Hart, Mears's Union Steward.  (Sheck Dep. Ex. 13.)  Sheck's notes show that he identified concerns similar to those he expressed on September 9.  (See id.)  He also set forth "action items" for Mears's training, including

additional remedial training sessions.  (Id.)  According to his notes, Mears "went up to the white board in the room and attempted to explain the shutdown procedure of [a compressor].  She went into things like the ideal gas law and theoretical chemistry methods.  [Sheck] and [Hart] asked her a number of questions she answered but they said her answers were not correct."  (Id.)  Mears complained that Sheck's concerns were "nothing but harassment," and asked for a meeting with HR because "Sheck told her she would never pass the qualification test for a PL . . . [s]he asked for a dedicated trainer but was never given one," and she asked for an adjustment to her schedule.  (Id.)  She also said one PL had refused to train her, but she acknowledged this situation had been corrected.  (Id.)  Sheck addressed her concerns in the meeting and ensured she knew how to lodge a complaint with HR if she chose to do so.  (Id.)  Ahluwalia ended the meeting "by saying to Mears that the goal here is to get her trained and qualified as a PL."  (Id.)

The same day, Mears reiterated her complaints about Sheck to Sara Lewke, an HR Leader at FHR.  Mears told Lewke that she believed she was being treated differently because she was female.  (Mears Dep. 162–63; Lewke Decl. ¶ 1–2.)  Lewke passed Mears's complaints to Hinderaker, who promptly investigated them.  (Hinderaker 20–21.)  Hinderaker interviewed multiple FHR employees who had interacted with Mears.  On October 6, she met with Mears to discuss her findings.  (Id. 24–25, Ex. K.)  She had uncovered "no evidence that [Mears] was treated differently because [she was] female."  (Id. Ex. K.)  Instead, her investigation "validated the feedback from [Sheck]" regarding the issues with Mears's performance identified by the PLs.  (Id.)  Hinderaker reiterated FHR's concerns with Mears's technical knowledge, multitasking ability, and response to

radio calls.  (Id.)  She also advised Mears to "be open to feedback," and that she would

"need to see more respectful interactions," as co-workers described Mears as

"argumentative" and "defensive."  (Id.)  Mears could not recall specific details of this

conversation, but she testified that she "didn't understand" Hinderaker's feedback about

her interactions with her co-workers.  (Mears Dep. 164.)

Sheck and McDonald held two more training sessions with Mears on October 9

and 15.  Sheck's notes contain some positive observations of Mears's performance, but

they also indicate Mears continued to struggle with technical details, specifically

surrounding compressor startup and shutdown.  (e.g., Sheck Dep. Ex. 9 at 5 ("She does

not understand critical concepts as well as she should for 11 months into training.").)  In

each meeting, Sheck identified specific areas in which Mears needed improvement.

On October 20, five days after Mears's final training session with Sheck and

McDonald, she was called into a meeting with Sheck, Hinderaker, Lewke, and others.

(Mears Dep. 165–67, Ex 32.)  Sheck informed Mears that she had failed to qualify as an

alky unit PL due to inadequate training progress.  (Id. Ex. 32.)  According to

Hinderaker's notes, Sheck identified two concerns with Mears's progress: a "[l]ack of

concept knowledge . . . and the inability to multi-task, specifically with respect to radio

communication."  (Id.)  On October 22, Sheck memorialized the termination of Mears's

training in writing:

> You are not making sufficient progress in your training for the [PL] role.
> There have been multiple concerns, which have been reviewed with you . . .
> You have not demonstrated an understanding of concept knowledge and
> you have not demonstrated the ability to multitask as required for the role

. . . Effective October 21, 2014, you are demoted from the [PL] Trainee position to your last successfully held role [at FHR]."

(Willing Decl. Ex. L.)  FHR replaced Mears with a male trainee;  it is unclear whether the position was filled based on seniority.

Shortly thereafter, Mears commenced this action in the Dakota County District Court, alleging FHR had violated the MHRA by (1) discriminating against her on the basis of her sex and disability and (2) retaliating against her.  FHR timely removed the action to this Court and, on December 9, 2016, moved for summary judgment.  The Motion has been fully briefed, and the Court heard argument on February 3, 2017.  The Motion is ripe for disposition.

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).  The moving party bears the burden of showing that the material facts in the case are undisputed.  Id. at 322; Whisenhunt v. Sw. Bell Tel., 573 F.3d 565, 568 (8th Cir. 2009).  The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009); Carraher v. Target Corp., 503 F.3d 714, 716 (8th Cir. 2007).  The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial.  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 256 (1986); Wingate v. Gage Cty. Sch. Dist., No. 34, 528 F.3d

1074, 1078–79 (8th Cir. 2008).

**ANALYSIS**[4]

## I.      Sex discrimination

Mears first alleges that FHR demoted her because she was female.  The MHRA

provides:  "[I]t is an unfair employment practice for an employer, because of . . . sex . . .

to . . . discharge an employee [or] discriminate against a person with respect to hiring,

tenure, compensation, terms, upgrading, conditions, facilities, or privileges of

employment."  Minn. Stat. § 363A.08.  Mears's disparate-treatment claim is analyzed

under the McDonnell Douglas framework.  (See Mem. in Opp'n 23–24 (citing

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)).)  Under this framework,

Mears must first establish a prima facie case of discrimination.[5]  If she does so, "the

burden shifts to [FHR] to articulate a legitimate, nondiscriminatory reason for [its] action.

If such a reason is proffered, then [Mears] must provide evidence from which a

---

[4] Mears, in her opposition brief, repeatedly makes factual assertions without citation to the record.  (See Mem. in Opp'n 22–34.)  As Federal Rule of Civil Procedure 56 makes clear, "the party asserting that a fact cannot be or is genuinely disputed *must* support the assertion by citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c).  It is equally clear that the Court "is not required to speculate on which portion of the record [a] party relies, nor is it obligated to wade through and search the entire record for some specific fact that might support th[at] party's claim."  Gilbert v. Des Moines Area Cmty. Coll., 495 F.3d 906, 915 (8th Cir. 2007); see also United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").  Accordingly, the Court considers only those portions of the record cited by Mears.  Fed. R. Civ. P. 56(c)(3).

[5] To state a prima facie case of discrimination based upon disparate treatment, Mears must proffer sufficient evidence that (1) she was a member of a protected group; (2) she was qualified to perform her job; (3) she suffered an adverse employment action; and (4) the adverse action "occurred under circumstances giving rise to an inference of discrimination."  Doucette v. Morrison Cty., Minn., 763 F.3d 978, 982 (8th Cir. 2014).

reasonable fact finder could conclude that the reason offered . . . is merely a pretext for" discrimination.  Clegg v. Ark. Dep't of Corr., 496 F.3d 922, 926 (8th Cir. 2007) (internal quotation marks and citations omitted).

The Court will assume *arguendo* that Mears has stated a prima facie case of discrimination.  See, e.g., Gibson v. Am. Greetings Corp., 670 F.3d 844, 855 (8th Cir. 2012) (assuming the plaintiff stated a prima facie case and disposing of the matter on pretext grounds).  As discussed, FHR has proffered legitimate, nondiscriminatory reasons for her demotion, namely, her inability to multitask and lack of technical knowledge.  See, e.g., Doucette v. Morrison Cty., Minn., 763 F.3d 978, 983 (8th Cir. 2014) ("A legitimate reason for discharge may include the plaintiff's lack of improvement in the specific areas in which she was counseled.") (internal quotations and citation omitted); Chambers v. Travelers Cos., 668 F.3d 559, 567 (8th Cir. 2012).  Accordingly, the dispositive question is whether Mears has proffered sufficient evidence to show FHR's reasons are a pretext for discrimination.  In the Court's view, the answer is "No."

Mears may demonstrate pretext by showing that FHR's explanations are "unworthy of credence . . . because [they have] no basis in fact," or by attempting to "persuade[] the [C]ourt that a [prohibited] reason more likely motivated [FHR]." Torgerson v. City of Rochester, 643 F.3d 1031, 1047 (8th Cir. 2011) (en banc) (internal citations and quotations omitted).  To satisfy the second prong, Mears may show, *inter alia*, that FHR "(1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision."  Lake v. Yellow Transp., Inc., 596 F.3d 871, 874 (8th Cir. 2010).  Mears

argues both that FHR's proffered explanations have no basis in fact and that a prohibited reason motivated her demotion, but her arguments are unavailing.

The core of Mears's claim is that FHR refused to allow her to observe the alky board during her training and instead relegated her to a desk in the corner of the room. Mears argues, without citation to the record, that she was "treated differently from similarly-situated coworkers" because "all of the men were allowed to train up at the board." (Mem. in Opp'n 24–25.) As mentioned, disparate treatment of similarly-situated coworkers may give rise to an inference of discrimination. Lake, 596 F.3d at 874. But Mears bears the burden of demonstrating that similarly-situated males fared better, Doucette, 763 F.3d at 983, and she identifies no male she contends is an appropriate comparator (see Mem. in Opp'n 24–25). She further makes no argument *how* she is similarly situated to any other FHR employee, a "rigorous" analysis at the pretext stage. Johnson v. Securitas Sec. Servs. USA, Inc., 769 F.3d 605, 613 (8th Cir. 2014). She does mention in passing her immediate predecessor, a male trainee who "sat at the board from the get go" and has since been terminated by FHR. (Mem. in Opp'n 6.) But this fleeting reference, without more, is insufficient to raise a triable issue on pretext. Doucette, 763 F.3d at 984 ("[The plaintiff] has not provided enough information regarding her two male co-workers that, if true, would give rise to a genuine issue of material fact.").

Again without citation to the record, Mears asserts that, "at the time of her [demotion], [she] had only been allowed to be up at the [alky] board observing for about six weeks." (Mem. in Opp'n 27.) This is contradicted by her contemporaneous journal, which indicates she had opportunities to observe the alky board as early as April, six

months prior to her demotion.  (Willing Decl. Ex. H.)  She appears to contend she should have been observing the board from her first day of training like her unnamed "comparator," and it is undisputed that board observation is helpful for trainees.  But Mears cites no FHR policy requiring trainees to observe the board immediately, she identifies no similarly-situated male who fared better, and she does not claim any FHR employee required her to stay away from the board until she completed her bookwork.[6] Faced with this dearth of evidence, no reasonable jury could infer discrimination from her opportunities to observe the alky board.

Mears further argues that Sheck's concerns about her inability to multitask have no basis in fact because FHR directs PL trainees *not* to multitask.  (Mem. in Opp'n 25.) True, the "Trainee Expectations and Responsibilities" form she received on her first day instructed her to "[f]ocus on one task at a time" and "[b]e sure you are comfortable with your ability to perform the task before you move on."  (Mears Dep. Ex. 25.)  However, in her deposition, Mears acknowledged that PLs are required to multitask.  (Mears Dep. 123.)  Indeed, FHR made this requirement clear from the outset—the PL job posting advised that the PL "monitor[s] unit process via eight screens for a full shift," and "[d]uring emergency situations may . . . work continuously adjusting parameters (temperature, pressure, flow) . . . until the situation is resolved."  (Mears Dep. Ex. 17.) This is multitasking.  In the Court's view, FHR's admonition to "focus on one task at a

---

[6] Mears avers that "Sheck instructed [her] to sit at that desk from the first day of [her] training," and that, sometime in August, Sheck "finally allowed [her] to sit and observe the board while [she] trained."  (Mears Decl. ¶¶ 7, 18.)  But it is clear Sheck did not mandate she complete all of her bookwork before observing the alky board, as her journal indicates she observed the board repeatedly prior to August.

time" as she reviewed *training materials* does not suggest that FHR's concern—arising after she began Skills Demonstration—is illegitimate.

Mears next argues FHR failed to follow its own policy with respect to the length of her training because, on her first day, Sheck indicated that her "Planned Training End Date" was eight months later rather than the "default" twelve months. (Mem. in Opp'n 27.) But this argument is unpersuasive, as Mears was simply given a *planned* end date. (Mears Dep. Ex. 25.) The same form provides "[FHR] does not require you to become qualified by a certain date . . . The amount of time it takes to qualify varies . . . because we all learn at different paces." (Id.) Further, Sheck testified that, though the alky board was a less complicated console, he did not expect Mears to complete her training in eight months. (Sheck Dep. 12.) Most notably, it is undisputed that FHR trained Mears for more than eight months. As such, the Court discerns no variation from FHR policy, and no reasonable jury could infer discrimination from Mears's planned end date.

Finally, Mears discusses the explanations FHR provided for her demotion, and she correctly notes that shifting explanations for an adverse employment action may evidence pretext. (Mem. in Opp'n 29–31.) Absent from her argument, however, is a showing that FHR's explanations actually shifted. (See id.) This is likely because those explanations—from Sheck's September 3 meeting with Mears through her October 22 demotion letter, including those quoted in Mears's brief—are entirely consistent. (Id.)

Overall, the record shows that FHR identified specific, performance-related issues with Mears, discussed them with her, and acted to help improve her performance. When Mears's performance did not improve to FHR's satisfaction, it demoted her from a

safety-sensitive position.  Mears minimizes her role in the incidents that, in part, gave rise to FHR's concerns about her performance.  But her subjective view of these incidents is not dispositive.  Instead, to prevail, she must put forth evidence that *FHR* was not truly concerned by her performance.  E.g., Fatemi v. White, 775 F.3d 1022, 1045 (8th Cir. 2015) ("A plaintiff seeking to survive an employer's motion for summary judgment must[] show a genuine issue for trial about whether the employer acted based on an intent to discriminate rather than on a good-faith belief that the employee committed misconduct justifying termination.").  She has not done so.  Accordingly, FHR is entitled to summary judgment.[7]

## II.   Reprisal

Mears also asserts that her demotion was motivated by her September 22 complaint that she was being treated differently because she was female.  (Mem. in Opp'n 32.)  The MHRA prohibits reprisal against any person who opposed a discriminatory practice.  Minn. Stat. § 363A.15.  To prove reprisal, Mears must show a causal connection between a protected activity and an adverse employment action.  Muor v. U.S. Bank Nat'l. Ass'n, 716 F.3d 1072, 1078 (8th Cir. 2013).  Here, she relies on the temporal proximity between her complaint and her demotion and, to be sure, temporal proximity may evidence such a causal connection.  Sieden v. Chipotle Mexican Grill,

[7] Mears also alleged that FHR discriminated against her based on her disabilities.  (Compl. ¶¶ 31–33.)  In her opposition, she referenced the Americans with Disabilities Act (though she has not alleged such a claim in her Complaint) and recited the elements of a prima facie case of disability discrimination, but offered no further analysis of this claim.  (Mem in Opp'n 23.)  At oral argument, Mears's counsel stated that the basis of her disability-discrimination claim is the same as her sex-discrimination claim.  Thus, in light of the Court's determination that Mears is unable to raise a genuine issue regarding pretext, FHR is also entitled to summary judgment on her disability-discrimination claim.

Inc., 846 F.3d 1013, 2017 WL 370859, at *3 (8th Cir. 2017).  But "[t]he fact that [FHR] expressed concerns about [Mears's] performance both before and after the protected activity undercuts the significance of the temporal proximity between that activity and the adverse employment action."  Id.  In the absence of other evidence of a causal connection, and in light of the Court's determination that FHR had legitimate reasons to demote Mears, FHR is entitled to summary judgment on her reprisal claim.  Hervey v. Cty. of Koochiching, 527 F.3d 711, 723 (8th Cir. 2008) (Generally, "more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation.") (citation omitted).

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that FHR's Motion for Summary Judgment (Doc. No. 27) is **GRANTED** and Mears's Complaint (Doc. No. 1-1) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**


Date:  February 23, 2017                    s/Richard H. Kyle
                                            RICHARD H. KYLE
                                            United States District Judge